# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANYCLO INTERNATIONAL INC.<br>a corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>YANG-SUP CHA<br>an individual, *et al.*<br><br>*Defendants.* | Civil Action No. 18-cv-5759 (PGS)<br><br>**MEMORANDUM** |

This matter is before the Court to find facts and conclude law pursuant to Federal Rule of Civil Procedure 52 after a four-day bench trial held between July 24 and 27, 2023.[1]   In this case, Plaintiff Anyclo International—a South Korean corporation—sues Yang-Sup Cha (hereinafter, "Defendant Cha"), Defendant Cha's wife, Nam Hee Kim ("Defendant Kim"), and Defendants Cha and Kim's son, Stafford Cha ("Defendant Stafford Cha").  Anyclo International also sues Anyclo USA—a New York Corporation—and Mojo Moto, LLC.

---

[1] The parties did not order transcripts, but a working version was prepared. Transcripts are referred to as follows:

      1T is testimony from July 24, 2023;
      2T is testimony from July 25, 2023;
      3T is testimony from July 26, 2023;
      4T is testimony from July 27, 2023.

In its Amended Complaint, Plaintiff brought thirteen causes of action. (*See* ECF No. 25).[2] At trial, however, Plaintiff only asserted claims against Defendants Cha and Kim on breach of contract (Count I), common law conversion (Count II), and fraud (Count VI). (*See* ECF No. 107). In addition, Plaintiff asserted claims for a reimbursement of monies Defendants spent on their legal fees in this litigation. For their part, Defendants counterclaimed for breach of contract as well as a previously unpled claim for wages by Defendant Nam-Hee Kim.

For the reasons below, the Court dismisses Counts III-V and VII-XIII with prejudice and finds that Plaintiff abandoned its claim against the remaining Defendants except Defendants Cha and Kim. The Court therefore enters judgment of no cause of action in favor of Defendants Stafford Cha, Mojo Moto, LLC, and Anyclo USA.

The Court finds in favor of Plaintiff for breach of contract and common law conversion claims. Plaintiff's fraud claim fails. As to attorney's fees, the Court finds that the parties did not present the Court with adequate information to support a finding on attorney's fees and it therefore fails.

---

[2] The Court notes for the record that the Amended Complaint misnumbers the Counts. The Court refers to the Counts in their appropriate numerical order.

Similarly, Defendants' breach of contract claim—as well as Defendant Kim's claim for wages—fail.

## I.

The Court discusses two issues that arose during trial prior to reciting its Findings of Fact.    These are the quality of the translation by the certified court translators and the provision of untranslated exhibits to the Court.

All of the litigants and their respective representatives were of South Korean origin; each of them spoke Korean fluently and English passably.  Some of litigants' counsel asserted that the translator was in error or not complete.  For example, at one point, Defendants' Counsel objected to the translation because "the interpreter has added to the witnesses' statement . . . ." (1T55:3–8).  At another point, there were two certified translators present during the trial with one at times correcting the other's translation. (*See, e.g.*, 4T82:1–4T83:2).  Since the interpreter was a certified court translator and neither party raised any issues with translation at or since the conclusion of trial, the Court relies on the translation of the certified court translators.

In terms of untranslated exhibits, Defendants introduced exhibits that were either entirely or partially in the Korean language; Defendants failed to provide the Court with an accompanying English translation. These are Exhibits D-6, D-23, and D-27. The Court is unable to rely on these exhibits or the information communicated

therein given the credibility determinations made of the witnesses discussed below. Therefore, it declines to rely on these exhibits in its analysis.

## II.

### A. Findings of Fact

1. Dong Guen Song, also referred to as Hopkins, (hereinafter, "Mr. Song") is the President and Director of Plaintiff Anyclo International. (1T14:16–18).

2. According to Mr. Song, Anyclo International "take[s] orders from garment brand companies and we manufacture clothing for those clients and export . . . those goods out of Korea." (1T14:23–1T15:2). Most of Anyclo International's clients were located on the West Coast of the United States. (1T15:12–14). Mr. Song estimated Anyclo International's annual sales to be approximately $40 million. (1T15–1T16).

3. In 2016, Mr. Song sought to expand Anyclo International's operations to the East Coast of the United States (1T16:5–6). Upon receiving a favorable recommendation from a business acquaintance, Mr. Song met with Defendant Yang-Sup Cha (hereinafter "Defendant Cha") in September 2016 in South Korea. (1T17:4–5, 18).

4. In the fall of 2016, Mr. Song—working as an agent of Anyclo International— reached an ongoing business relationship with Defendant Cha. Defendant Cha would generate new business by introducing buyers to Anyclo

International with whom Defendant Cha had prior experience.  (1T18:19–22; 1T18:2–6).

5. In September through October 2016, Defendant Cha and Mr. Song allegedly negotiated the terms of this arrangement by email.  These negotiations are detailed in Exhibit P-1.

6. Exhibit P-1 is a series of Korean language emails accompanied by English translations.   These emails concern the alleged relationship between Defendant Cha and Anyclo International.   Within Exhibit P-1, Mr. Song introduces Defendant Cha to certain managers of Anyclo International.   After a meeting in South Korea on September 26, 2016, these managers and Defendant Cha outlined the alleged terms of a business relationship between Anyclo International and Defendant Cha.

7. An October 19, 2016 email with the subject line "Anyclo NY brench (sic)" includes information sent by Defendant Cha to Jino Choi (hereinafter, "Mr. Choi"), Former Production Director at Anyclo International. This information was specific to establishing the Anyclo USA's office in New York.  (Ex. P-1 at 9).  Specifically, the email lays out several items—including both the timeline for the establishment of Anyclo USA's office in New York and the target date for the grand opening which was the end of October 2016.  (*Id.* at 9).

8. Exhibit P-1 also itemizes the start-up expenses for the incorporation of Anyclo USA. The start-up costs included a registration fee ($1,500.00); a security deposit of three-months' worth of rent ($5,757.00); the office's first month's rent ($1,919.00); a cost for office landline set-up ($350.00); and office supply costs, including printer, and desktop charges ($1,200.00). The total expenses equal $10,726.00 (*id.*). The address of the proposed office was 112 West 34th Street, New York, 10120. (*Id.*).

9. Exhibit P-1 noted that on top of the start-up costs above, there were monthly operating expenses to be paid on the twenty-fifth of each month commencing on November 25. 2016. (*Id.* at 10). Exhibit P-1 notes that Anyclo International would initially pay the start-up costs and the monthly operating costs to an individual account. After November 25, 2016, the monthly operating expenses would be paid to a corporate checking account of Anyclo USA. (*Id.*).

10. Under a line in Exhibit P-1 titled "Business Related," the email also states that business cards would be produced identifying Defendant Cha as the Branch Manager/Director with a note requesting recommendations for an English title for Defendant Cha. (*Id.*).

11. A subsequent email of Exhibit P-1 dated October 28, 2016 summarizes the terms of the relationship between Defendant Cha and Anyclo International.

6

This email includes Defendant Cha's monthly pay, local taxes, local hiring requirements, commission, Internal Revenue Service ("IRS") tax liability, New York state employment tax, and worker's compensation. (*Id.* at 17–18).

12. On November 23, 2016, this relationship was still not ironed out.  At that time, Mr. Choi sent an email to Defendant Cha: "Please proceed with incorporation as follows.  Please inform if there are any documents that headquarters needs to prepare."  (*Id.* at 23).  Defendant Cha replied that he would "[a]sk the accountant to proceed as instructed" and he would "inform [Mr. Choi] if the need [for further documents were to] arise[]." (*Id.*).  The body of the email included several details including the company name, the founder, the CEO, the business category, and the banking information for the bank account.  (*Id.* at 24).

13. On November 30, 2016, Mr. Choi emailed Defendant Cha again regarding "Anyclo USA Business and Incentive Plan."  Under this Plan, Defendant Cha would "receive 20% of operating profits + sales incentive upon achieving the business plan." (Ex. P-1 at 27).  The email included the following two tables:

| 2017 Business Plan | | |
|---|---|---|
| Revenue | US$5,000,000 | |
| Manufacturing margin | US$750,000 | 15% (based on ERP cost sheet) |
| Expenses | US$500,000 | 10% (including $150K for NY Branch) |
| Operating Profit | US$250,000 | 5% |

| Incentive 20% of operating profit + sales incentive | | | |
|---|---|---|---|
| Upon achieving business plan: US$50,000 | | | |
| Sales Incentive | | | |
| US$5 million or greater | US$6 million or greater | US$7 million or greater | US$8 million or greater |
| US$10,000 | US$15,000 | US$20,000 | US$25,000 |

14. In a response email dated December 4, 2016 with the subject line "RE New York Branch / Incentive plan," Defendant Cha wrote to Mr. Choi that "I think the incentive proposed is a bit less than the incentives I have agreed to so far. In my judgment, it should be at least 1.5% of total sales volume." (*Id.* at 27). (Exhibit P-1 at 27). However, Defendant Cha ambivalently accepted the commission of 20% operating profits plus the sales incentive because he would "comply with the company's decision for the first two years," but he requested an additional monthly payment of $1,000.00 for transportation costs. This raised the monthly expenses to $13,000. (*Id.*). While there was

8

no term to the contract in the correspondence, the tables provided in the emails suggest that the parties contemplated the contractual period to be for one year.

15. There is no formal written agreement that was executed by both parties. Instead, Exhibit P-1 is a series of offers and counteroffers sent between the parties that occurred over a period of time. Further, the precise scope of Defendant Cha's role or responsibilities is not clearly defined in Exhibit P-1, but the parties seemed to agree generally that Defendant Cha would undertake to sell materials for Anyclo International.

16. Overall, Exhibit P-1 shows that Defendant Cha and Anyclo International agreed that Defendant Cha would incorporate Anyclo USA, a subsidiary company of Anyclo International, in New York to be named Anyclo USA (1T18:19–22). Exhibit P-1 shows that Anyclo International would fund the start-up costs and the monthly operating expenses, and Defendant Cha would attempt to make sales on behalf of Anyclo International. It also shows that Anyclo International was understood to have 100% of the equity in Anyclo USA. (Ex. P-1 at 24).

17. Mr. Song testified that during the November and December 2016 time period, he was not familiar with federal taxes—either personal or business—worker compensation, and other costs; accordingly, Mr. Song relied on Defendant Cha's representations regarding the start-up costs and the monthly operating

costs without conducting further personal investigation. (1T22:16–1T23:8). Mr. Song testified:

> It was not easy for us to find out through internet because I was not familiar with – so basically I was not familiar with the situation in the US at that time . . . .

(1T22:18–21). The record does not demonstrate that Defendant Cha had any practical experience in establishing a corporate organization like Anyclo USA nor that Defendant Cha had any experience with United States tax matters.

18. Thus, with this flimsy series of emails at Exhibit P-1—and no documented experience in establishing a corporation—Defendant Cha and Anyclo International commenced working together in November 2016.

19. Beginning in this same month, Anyclo International paid the monthly operational expenses and the start-up costs by way of a wire transfer into an account in the name of Defendant Stafford Cha, Defendants Cha and Kim's son. (1T30:25–1T32:4).

20. When asked why he deposited the funds with Defendant Stafford Cha, Mr. Song stated that he believed that Defendant Stafford Cha was the same individual as Defendant Yang-Sup Cha. (*E.g*, 1T31:2–18).   Mr. Song testified:

> Q.   Do you know what [who] Stafford Cha is?
>
> A.   I know that now. At that time, I didn't know.

> Q.   Could you tell the court who you believe Stafford Cha is now?
>
> A.   At that time, I understand Stafford Cha to be Mr. Yang-Sup Cha, but now I understand that Stafford Cha is his son.

(1T31:6–11).

21. Further, according to Mr. Song, he agreed to transmit funds ahead of the incorporation because the law required companies to be organized under the laws of a state and registered with the IRS to obtain an Employee Identification Number ("EIN") before a bank account could be opened. (*See* 2T9:25–2T10:23). Since Anyclo International had no other entity established in the United States, Anyclo International deposited those sums with Defendant Stafford Cha until such time that Anyclo USA was incorporated and registered with the IRS.

22. Overall, this was a curious decision to deposit money with an individual with a different name than that of the person with whom Mr. Song had been dealing. Mr. Song, a sophisticated international businessman, transmitted payment to someone who Mr. Song did not know but of whom Mr. Song assumed the identity. This payment by a sophisticated corporate executive like Mr. Song flies in the face of common sense and experience. Further, it demonstrates a lack due diligence.

23. Another issue arising from this arrangement was the fact that Defendant Cha misrepresented the costs of starting up a business to Mr. Song. Specifically,

he altered the first two pages of a legal document he himself executed in connection with the leasing of the third, fifth, and sixth floors at 1441 Broadway, New York, New York 10018. (*See* Exs. P-2, P-3).

24. In connection with Anyclo USA's office, Defendant Cha provided Anyclo International with a License Agreement found at Exhibit P-2 (hereinafter, the "Doctored Agreement") dated November 2, 2016. This License Agreement, however, is a doctored version of the original document found at Exhibit P-3; specifically, the first two pages of Exhibit P-3 are altered.[3] The Doctored Agreement laid out the licensor as Mojomoto Suites LLC with the license fee listed at $2,100 per month, the initial setup fee as $500, and the security deposit as $6,300. This Doctored Agreement represented an alteration of the original license agreement found at Exhibit P-3 where Times Square Suites LLC was listed as the Licensor and the monthly base license fee was $1,800, the initial setup fee was $300—but waived—and the security deposit was $3,600. Importantly, Mojomoto Suites LLC was a company created by Defendant Cha himself for the purpose of this deceit and replaced the actual licensor of the building. (*See* 3T33–3T35). The term of the agreement was

---

[3] Defendant Cha's deceit did not end here. During trial testimony, it came to light that Defendant Cha created a second doctored license agreement  found at Exhibit P-19 to conceal his initial deception from Plaintiff's lawyers. (3T39:1-17).

unchanged between the two documents and was scheduled to run from November 1, 2016 through October 31, 2017. (*See* Exs. P-2, P-3).

25. From this company he himself created, Defendant Cha would invoice Anyclo International and have costs paid directly to himself. (*See* Ex. P-18). This invoice went so far as to charge sales tax on the invoice. (*Id.*). Operating expenses were $13,000 a month. *See supra* at ¶ 14.

26. Notwithstanding this trickery, Defendant Cha accomplished the opening of an office in the United States for Anyclo International, the creation of a bank account for the same, and the incorporation of Anyclo USA.

27. In late November 2016, Mr. Song acknowledged that he received the incorporation papers of Anyclo USA; the corporate documents designated Defendant Cha as the "person who will accept the process," *i.e.*, the registered agent. (1T61:21–1T62:19).

28. During this time period, Defendant Cha engaged in leasing office space in New York City from where Anyclo USA would operate. (1T22:7–1T24:2). At that time, Defendant Cha signed and/or endorsed the lease agreement personally because Anyclo USA was not yet incorporated. (*Id.*).

29. Defendant Cha delivered the corporate book to Mr. Song in December 2016. (1T63:1–6). The corporate book included the certificate of incorporation;

otherwise, the corporate book was blank. (1T63:9–13). Notably, no shares were issued.

30. At that time, Mr. Song and Defendant Cha had not discussed whether common shares could be issued to Anyclo International. (1T63:16–17). Instead, Mr. Song maintained the corporate book as is (blank) because he "thought [he] just had to keep it with [him]." (1T63:16–20).

31. Once Anyclo USA was incorporated and registered with the IRS, Defendant Cha opened a corporate checking account with Bank of America (hereinafter, the "BOA Account"). (1T71:18-24). In establishing the BOA Account, Defendant Cha and his wife, Nam Hee Kim (hereinafter "Defendant Kim") named themselves as the sole authorized signatories of Anyclo USA's BOA Account. (1T36:3–5). On the formation papers underpinning the BOA Account, no representative of Anyclo International was an authorized a signatory. (1T35:20–1T36:7). More particularly, Mr. Song and his managers—Mr. Cris Lee and Ms. Alice Lee—were not authorized signatories.

32. According to Mr. Song, from the outset of the account, Defendant Kim was the "person who withdrew all the funds" from the BOA Account between December 2016 and December 2018. (1T71:18–1T72:6).

33. As such, the lease failed to identify Anyclo International or any Anyclo International representative who exercised control or possessed rights as a

tenant under the lease.    As such, Mr. Song and his managers were not recognized as authorized tenants.  (1T66:4–1T67:18).

34. Despite (1) the lack of stock issuance of Anyclo USA to Anyclo International, (2) the lack of control over the BOA Account, and (3) lack of access to the leasehold, the start-up costs and monthly operating expenses were paid timely between November 2016 until about August 2017.

35. From the above testimony, I find that Mr. Song and other managers of Anyclo International failed to take appropriate precautions or oversight over Anyclo USA.

36. During this time period, Defendant Cha contacted prospective buyers on behalf of Anyclo USA.  As he testified at trial: "I contacted the buyers and I visited buyers in order for me to sell the product." (3T115:19–20).  Defendant Cha sold product to the buyer's companies.    Anyclo International manufactured the product and delivered same to the buyers.

37. There was an established business practice followed by Defendant Cha and Anyclo International. Specifically, when Anyclo International delivered product to a buyer, the buyer would pay Anyclo USA.  Apparently believing that their agreement meant that Defendant Cha was to remit the full amounts of money received from third-party buyers, Mr. Song became suspicious in Fall 2017 because he believed Defendant Cha was not transmitting the full

payments that had been received by Anyclo USA. (1T39:9–11).  Mr. Song stated that Defendant Cha "would not send money back to us . . . . Also the payment from the buyers were sent to us partially."  (1T39:15–21).  He continued: "it is a clear sign that something is not going right."  (1T39:22– 1T40:19).

38. And indeed, Mr. Song's instincts were correct.  For instance, Anyclo USA received a wire from Reflex Performance on April 27, 2017 for $203,524.40. (Ex. P-7 at 19).  This same month, Anyclo USA received a $13,000 wire from Anyclo International to pay Anyclo USA's expenses on April 24, 2017. (*Id.*). Defendant Cha only remitted $200,900.20 to Anyclo International on May 2, 2017.  (Ex. P-7 at 23).  Thus, Defendant Cha retained $2,624.20 of the third-party payment without explanation.

39. After becoming suspicious, Mr. Song reduced the payments of the monthly operating expenses to $10,000 for the months of August, September, and November 2017. It was Mr. Song's testimony that he reduced the monthly operating expenses because the balance in the BOA Account was sufficient to allow Defendant Cha to withdraw the difference. (1T52:14–20).

40. By December 2017, Mr. Song concluded that Defendant Cha was "stealing" Anyclo International's funds.  (1T50:25–1T51:9).  Accordingly, Mr. Song did not authorize the December 2017 monthly payment.  Suffice it say, this is the

point where any remaining business relationship between the parties began to crumble.

41. Meanwhile, Defendant Cha learned that representatives of Anyclo International were directly communicating with Defendant Cha's contacts (that is, his buyers) to exclude Defendant Cha from the sales process. (2T47:11–22). Defendant Cha further asserts that representatives of Anyclo defamed his reputation in the garment industry during their communications. *See infra* ¶ 48.

42. Disputes also arose over the payment of Defendant Cha's commission for the sales he made on behalf of Anyclo International. Exhibit D-34 summarizes the sales transactions between Anyclo International and a third-party seller, Moret, in various years including 2017. Mr. Song testified that his accounting department determined that Defendant Cha was not entitled to a commission, (2T40:17–24), because—as Mr. Song stated—the accounting department reported "said minus, loss of the business. And the report showed a total sales and the minus profit . . . ." (2T40:23–2T41:5).

43. As a result, sometime in the last two months of 2017, Mr. Song forwarded the accounting department's report and its finding that there was no profit on the sales to Defendant Cha concluding that "I hope we will do better business in 2018." (2T40:23–2T41:5).

44. Sometime in January 2018, Defendant Cha ceased communication with Anyclo International. Without any communication with Defendant Cha, Mr. Song attempted to seize control and secure the assets of Anyclo USA. At this point, Mr. Song had no access to the office space or the BOA Account.

45. Mr. Song faced a predicament. He summed it up aptly:

> A.   First of all, Anyclo USA's employee is only one person [Cha] . . . when it comes to my ownership of the company, I was not able to do anything about it, I was not able to access anything. I was not allowed to even go up to the office, therefore I was not any party of the company with any rights to the company.

> Q.   So is that the proof that you're not the owner of Anyclo USA?

> A.   That is correct. First of all, certificate of incorporation, New York State division of incorporation and EIN, IRS, any records with them, I could not find my name. It was only Mr. Cha's name on it, Mr. Cha's name in all of them.

> Q.   So isn't that showing your misunderstanding of the ownership of Anyclo USA?

> A.   I don't think it was a misunderstanding. First of all, the true owner should be able to deposit or withdraw money. Also; the true owner should be able to make – open a credit card. Also, the true owner should be able to even enter any kind of lease agreement. Defendant did all of them, but he gave me just one document, which was a blank document, so just based on that, could I think I was the owner of this company? I think it just didn't make any sense.

Q.     So from the time the company Anyclo America was incorporated in November of 2016, until the real dispute broke out in February 2018, for fourteen months, you didn't really find out who was real owner was?

A. Yes, I thought I was the owner.

Q.     Okay. Mr. Song, earlier you testified that Mr. Cha is authorized to sign checks with the bank, correct?

A.     When it comes to that, I found out only after the subpoena that all that was done by Ms. Nam-Hee Kim, all checks were signed by her. So even now, I cannot tell who the real owner is anymore. I want to know that.

Q.     You want to find out?  Did you search all the documents from the banks?

A.     BOA, Chase and PNC.

Q.     Did you receive all the bank documents, not just the bank statements?

A.     What other documents?

Q.     Well, I mean who is authorized to sign for the company Anyclo America.

A.     No, I have not received anything like that. The employees, the number of employees I have is not just one or two. Ten or twenty. We are talking about maybe one employee in Anyclo USA.

Q.     I don't understand.

A.     The only employee of Anyclo USA was one person, Mr. Cha. So I think Mr. Cha was the only person in those – with those authorities.

> Q. So isn't that true, Mr. Cha is the only authorized person by the company, Anyclo USA?
>
> A. No. Again – that's what I thought, but after I did some research, what I found out afterwards, it was Ms. Nam-Hee Kim.

(1T67:25–1T70:7).

46. During this same time period of January 2018, Defendant Cha refused to remit any further funds from the BOA Account to Anyclo International.

47. Toward the end of February 2018, Mr. Song traveled to New York to confront Defendant Cha.   (1T55:24–1T56:4).  Mr. Song visited Defendant Cha's residence in New Jersey. (1T56:5–7).  According to Mr. Song, Defendant Cha was home, but Defendant Cha refused to answer the door.  (1T56:8–13).  On February 23, 2018 through its counsel, Anyclo International sent a notice to Defendant Cha demanding the return of the monies owed.  (*See* 1T75:4–18).

48. On February 24, 2018, Mr. Song emailed some of Defendant Cha's buyers and informed them about the dispute between Mr. Song and Defendant Cha. (*See* Ex. D-22).  In an email to a buyer on which Defendant Cha is CC'ed, Mr. Song wrote the following. In relevant part, the email states: "Attn. Cha Please call me immediately i/o hiding.  (sic).  No need double face (sic). I do Not want disturb Moret and other customers anymore due to your disconnection with company moment. (sic).  CALL ME NOW and do Not make any further problem for customers.  (sic)."  (Ex. D-22).

20

49. On February 26, 2018, Plaintiff terminated Anyclo USA's company email address. (ECF No. 108 at ¶ 46).

50. After many unanswered calls and emails from Mr. Song, Defendant Cha agreed to meet to discuss the dissolution of their business relationship. According to Mr. Song, at the meeting Defendant Cha demanded three things: a) that the operating expenses be paid for the alleged contract period of two years; b) that Defendant Cha be paid a percentage of gross sales as commission; and c) that Mr. Song forward a letter to the buyers "explaining . . . that the incident was just an internal misunderstanding." (1T58:6–25).

51. In return, Defendant Cha would forward $250,000 to Anyclo International. Once the letters were forwarded, Defendant Cha would transmit another $250,000. Around that time, Defendant Cha transmitted $250,000 to Anyclo International from the BOA Account. (1T60:8–9).

52. Mr. Song did not forward the explanatory letter to the buyers. As a result, Defendant Cha did not transmit the discussed $250,000 to Anyclo International. Meanwhile, in March 2018 Defendant Kim withdrew eight checks in the amount of $13,000 each, totaling $104,000. (Exhibit P-7 at 153–61). Additionally, Defendants Cha and Kim withdrew $5,000.00 that they used to pay Graham Curtin, their legal counsel. Graham Curtin later merged

with McElroy Deutsch.  Defendant Cha would later pay McElroy Deutsch $45,278.76 in fees from the BOA Account.

53. Plaintiff filed the Complaint in this case on April 9, 2018.  (*See* ECF No. 1).

54. Around four months after the filing of the Complaint, on August 2, 2018, a third-party buyer paid $97,386.46 to Anyclo USA's BOA Account. (Ex. P-7 at 97; *see* 2T88:14–24).  Plaintiff claims that this was a mistake by the third-party buyer.  However, the precise reason for this payment was not made clear through trial testimony.

### III.

At a bench trial, the Court has three roles.  The Court's duty is (1) to decide the facts from the evidence that was presented during the trial; (2) to apply the law to the facts; and (3) to clearly explain the facts and the legal principles underpinning its decision.

As the trier of fact, I perform my duties fairly and impartially, and I follow the same preliminary charges that I instruct ordinarily to a jury.  More particularly, I consider all the evidence presented and use my common sense—in light of everyday experience with people and events—to determine the credible facts and I give the evidence whatever weight I believed it deserved.  *See* Third Circuit Model Jury Charge § 1.5.

## A. **Credibility of Witnesses**

In determining the credibility of witnesses, I am guided by the Third Circuit's

Model Jury Charge Section 1.7.  It reads:

> In deciding what the facts are, you may have to decide what testimony
> you believe and what testimony you do not believe. You are the sole
> judges of the credibility of the witnesses. "Credibility" means whether
> a witness is worthy of belief. You may believe everything a witness
> says or only part of it or none of it. In deciding what to believe, you
> may consider a number of factors, including the following:

> > (1) the opportunity and ability of the witness to see or hear or
> > know  the things the  witness testifies to;

> > (2) the quality of the witness's understanding and memory;

> > (3) the witness's manner while testifying;

> > (4) whether the witness has an interest in the outcome of the case
> > or any motive, bias or prejudice;

> > (5) whether the witness is contradicted by anything the witness
> > said or wrote before  trial or by other evidence;

> > (6) how reasonable the witness's testimony is when considered
> > in the light of other evidence that you believe; and

> > (7) any other factors that bear on believability.

Applying the instruction, I assessed the credibility of the witnesses.  I found

that all witnesses lack credibility.  I discuss the witnesses below.

### a. **Mr. Dong Geun Song**

Mr. Dong Geun Song, also known as Hopkins, ("Mr. Song") is the President and Director of Anyclo International. (1T14:16–18).  He lives in Seoul, South Korea. (1T14:11–12).  At trial, he testified to his interactions with Defendants.  I find that the testimony of Mr. Song is not credible or worthy of belief for the reasons below.

From my observations of Mr. Song at trial, his attitude was revengeful and spiteful against Defendant Cha.   There are several reasons for this. The first stems from legal troubles which arose that are related to this litigation.   Specifically, Defendant Cha complained to the United States Customs Office about Anyclo International's underpayment of customs fees due.  (*See* 4T61:3–10). As a result of Defendant Cha's complaint, Anyclo International settled with the Customs Office for over $2 million dollars.  (*See* 2T72:8–18).

Aside from this concrete motivation for their mutual dislike, Mr. Song's testimony emphasized the wrongful acts of Defendant Cha instead of communicating a narrative of events that occurred between the two parties—a narrative that acknowledged Mr. Song's own carelessness.  For instance, Mr. Song's decisions to wholly rely on Defendant Cha's representations regarding the start-up costs involved with building an American subsidiary and the legal obligations required of the same are decisions where Mr. Song bears some responsibility.  (*See* 1T21–1T25).   Another example where Mr. Song could have acknowledged his own shortcomings surrounds Mr. Song's treatment of the funds he was sending to start-

24

up Anyclo USA.   Mr. Song decided to wire money to an unknown individual. Specifically, Mr. Song wired money to Defendant Stafford Cha rather than Defendant Yang-Sup Cha because he assumed they were the same person.  (*E.g*, 1T31:2–18).  No reasonable person, much less a sophisticated business person like Mr. Song, would do such a thing.

In short, Mr. Song's testimony was that Defendant Cha was the sole cause of the controversy, and Mr. Song seeks as much damages as possible.  It was not trustworthy testimony because Mr. Song is upset about the U.S. custom's fine. Further, Mr. Song's own imprudent actions played no part in Mr. Song's calculations or interpretations of the wrongdoing that occurred.   Accordingly, Mr. Song's testimony lacked credibility.

## b. **Defendants Yang-Sup Cha and Nam Hee Kim**

Yang-Sup Cha ("Defendant Cha") is the former Director of Anyclo USA.  He and his wife, Nam Hee Kim ("Defendant Kim") live in Manalapan, New Jersey. (3T101:14–20).  In a similar way to Mr. Song, Defendants Cha and Kim are not credible or worthy of belief.

For his part, Defendant Cha aggressively attacked Mr. Song's testimony to avoid any liability. Like Mr. Song, Defendant Cha's testimony was not credible because he failed to acknowledge his culpability in the destruction of the parties'

business relationship, and Defendant Cha testified as a means to limit liability rather than testifying truthfully. For instance, Defendant Cha testified that he and Mr. Song had an agreement that Mr. Song "did not keep[,]" and Mr. Song "broke[] the contract" (3T49:23–25). Defendant Cha justified the fact that he took money from Anyclo International by noting that Anyclo International initiated the lawsuit. (3T50:2–20).

All of this behavior does not even address the fraudulent behaviors in which Defendant Cha engaged, such as doctoring multiple license agreements—both before and during the course of litigation. For instance, Defendant Cha attempted to conceal his deception from Plaintiff's lawyers in this case, and he created a third license agreement—found at Exhibit P-19—during discovery in an attempt to conceal his initial deception. (3T38–3T40). These deceits—deceits reaching into the very litigation process itself—render his testimony wholly uncredible.

Regarding Defendant Kim, the Court finds her testimony uncredible. Defendant Kim claimed that she worked full time even though she was not promised a wage "[b]ecause [she] wanted the company that [her] husband work[ed] for [to have good results." (4T69:23–24). She also claimed that "[o]nce [she] received the business card, [she] believe that she had the obligation to work hard for them." (4T70:5–11). First, the Court believes that—absent dire straits—no one would agree to work fulltime without a concrete contract or agreement for wages.

26

Defendant Kim—an established professional woman—is not an individual who was in dire straits when her husband, Defendant Cha, and Anyclo International initiated their professional relationship. Second, given her husbands' deep involvement in this litigation, the Court believes Defendant Kim's testimony paints her husband in this best light possible while minimizing his wrongdoing. For these reasons, the Court does not find her testimony credible.

### c. **Mr. Cris Lee**

Mr. Cris Lee ("Mr. Lee") is the Head of Finance at Anyclo International. I find that the testimony of Mr. Lee lacks trustworthiness given that he relied almost exclusively on a report that the Court does not believe to be credible.

Mr. Lee relies extensively on a report he prepared that tracks all the transactions within the BOA Account account from December 2016 through February 2019. These transactions are found in the bank statements at Exhibit P-7. The report prepared by Mr. Lee is found at Exhibit P-13. Exhibit P-13 appears to be an excel titled "Bank account details of Anyclo USA Inc." It is undated, and it shows transactions running from December 15, 2016 through February 2019; it shows the amounts deposited, the amounts withdrawn, and the amounts transmitted to Anyclo International.

Exbibit P-13 is untrustworthy for several reasons. First, Mr. Lee is an employee of Anyclo International, not Anyclo USA; his testimony was biased in favor of his employer. For instance, Mr. Lee drew inferences based upon this allegiance. During his testimony, when Plaintiff's Counsel was questioning Mr. Lee, Plaintiff's Counsel asked: "That would mean that the defendants were spending the buyer funds out of Anyclo USA's account in your accounting experience, correct?" (2T101:11–13). When the Court asked that Mr. Lee clarify the lawyer's statement, Mr. Lee testified to the fact that only a portion of the remaining money was transferred to Anyclo. (2T101–2T104:9).

Second, and perhaps more importantly, Mr. Lee was not qualified as an expert witness at trial to make these determinations. Mr. Lee testified extensively to the transfer of funds, the reading of financial statements, and other financial matters. As such, his testimony as to the reconciliation of the BOA Account was not subject to the safeguards set forth in the Federal Rules of Evidence 702-704. Accordingly, the Court declines to rely on Mr. Lee's testimony or Exhibit P-13.

## B. Conclusions of Law

### a. Legal Fees

The Court first addresses the issue of attorney's fees, or rather, the reimbursement of monies that Defendants used from the BOA Account to pay their

own legal fees.  Anyclo International asserts that legal fees were paid to two law firms from the BOA Account and that those fees primarily relate to the legal defense of Defendants Cha and Kim.  Plaintiff wishes that the reimbursement of these costs be paid to Anyclo International.

First, no legal bills or retainer agreements between the Defendants and the law firms were submitted into evidence.   Second, Anyclo International sued five different defendants: Defendant Cha, Defendant Kim, Defendant Stafford Cha, Anyclo USA, and Mojo Moto, LLC.   There are no facts or bills from which to determine the number of hours of professional time that was spent on each Defendant.  For instance, looking merely at the docket entries, the Answer and Counterclaim submitted by McElroy, Deutsch, Mulvaney and Carpenter was filed on behalf of all Defendants. (*See* ECF No. 6).

Anyclo International must show by a preponderance of the evidence that the legal fees related solely to the defense of Defendants Cha and Kim.  Plaintiff has not met that burden. Thus, the Court concludes that there is no evidence shown that the legal fees related solely to the defense of Defendants Cha and Kim; to determine otherwise without any evaluation of the bills and retainer agreements is speculative.

The claim is denied.

### b. **Wages of Defendant Nam Hee Kim**

Defendant Kim claims she is due $6,000 per month for a fourteen-month period of work for Anyclo International totaling $84,000. This claim is denied for several reasons which are detailed below.

First, this salary claim was raised at the eleventh hour. It was not plead as a counterclaim or as a third-party complaint. Evidently, the issue arose during the preparation of the Final Pretrial Order, and the Final Pretrial Order determined that the trial judge should decide whether this issue was raised in a timely manner. Defendants' Counsel presented this salary claim in his opening at trial:

> [W]e're also asking that Mrs. Kim, who is another defendant, she worked hard day and night for over a year and she didn't get a penny out of this. Only reason was she wanted to do this for her family and to make more sales and more commission out of this. But she didn't get anything, so we ask Your Honor to decide that there should be some . . . payments to Mrs. Kim in this case.

(1T12:13–21). Surprisingly, Plaintiff's counsel did not object to the claim or the way it was raised. Plaintiff's Counsel remarked: "I do not have a problem with allowing [Defendants Cha and Kim] to proceed with what they want to present." (1T13:3–7). Such a claim cannot be presented on the eve of trial. The lack of notice and ability to defend against this claim runs contrary to the rules of trial practice.

Second, even assuming *arguendo* that the merits of the salary claim were plead, it would still be denied. The wage claim is not supported by any documents.

There is no written contract or memorandum setting forth the terms of employment between Kim and Anyclo International or Anyclo USA.

Third, Defendant Kim's claims that she was an employee working for a salary was not supported by the testimony at trial. For instance, Mr. Song testified that he "wanted [Defendant Kim] to work for [Anyclo]." (1T49:21–T50:6). Later, Mr. Song confirmed he never employed her, stating that he "never hired and . . . never ha[d] terminated Kim." (2T54:2–7). However, Mr. Song acknowledged that Defendant Kim was provided with an Anyclo email address, and a business card because "the two of them Kim and Cha were always together." (2T52:3).

For her part, Defendant Kim did not totally disagree with Mr. Song's testimony. Defendant Kim testified that she never requested representatives of Anyclo International to pay her for her work. She stated:

> Q.    Ms. Kim, do you have any agreement or did you ever request during the course of this business arrangement to be paid by Anyclo International?
>
> A.    No.

(4T78:6–9). Defendant Kim explained that she worked fulltime knowing that Anyclo International had not promised to pay her for work. (4T69:17–24). She worked because she "wanted the company that my husband works for would have good results, so I helped hard." (4T69:22–24). I do not find it credible that Defendant Kim would have agreed to work fulltime for free. Rather, it is more likely

31

that her work was understood to be taken in conjunction with that of her husband, and her work as a solo employee was never contemplated by any of the parties.

Fourth—even if the Court were to determine that there was some foundation to this claim—Defendant Kim has provided no documentation to the Court on which the Court should base the calculation of her salary. Instead, to prove the value of her services, Defendant Kim likened her job responsibilities to those she had with another company, Choi and Shin. Defendant Kim claims her work for Choi and Shin was like the work she performed for Anyclo International. That company paid Defendant Kim $6,000 per month for work she performed. (4T71:18–4T72:23). Defendant Kim asserts Anyclo International should pay her the same amount as Choi and Shin, or $84,000—comprised of a $6,000-per-month salary for a period of fourteen months. Putting aside the fact that there is no formal employment contract in this case, Defendant Kim fails to set forth the number of hours worked or provide any invoices or documents to the Court supporting that she did this work; rather, she presents a series of emails that she says supports her claim. (4T67–4T77:19). Defendant Kim fails to demonstrate by a preponderance of evidence any facts that her job responsibilities were the same for both jobs except her conclusory statements.

All of these facts lead to the conclusion that Defendant Kim's work was but a part of the relationship between Defendant Cha and Anyclo International.

Accordingly, it is more likely that Defendant Kim's efforts—if considered at all—were a component of the $13,000 monthly operating payment.

As such, the claim for wages by Defendant Kim is denied.

### c. **Breach of Contract**

#### i. **Anyclo USA and Anyclo International's Business Relationship**

Plaintiff argues that because of Defendant Cha's breach of their implied contract, Plaintiff suffered a loss of $415,939.78.    (ECF No. 197 at ¶ 25). Defendants counterclaim, arguing that Defendant Cha is entitled to the remaining contractual payment amount of $13,000 per month for the alleged remaining term of a two-year contract and is entitled to 1.5% of the sales that Anyclo International made with Defendant Cha's customers after the disintegration of Plaintiff and Defendant Cha's business relationship into the 2018 year.  Although related to his claim for breach of contract, the Court separates Defendant Cha's claim for the commissions from his breach of contract claim, discussing both separately.

Plaintiff admits it did not have a formal contract with Defendants, and Plaintiff instead claims that it had an implied contract with Defendant Cha to incorporate and operate Anyclo USA; this implied contract arose from meetings, discussions, and e-mailed correspondence between Plaintiff Defendant Cha. (ECF No. 107 at ¶¶ 8–9).

Defendants appear to argue that the parties had both an implied and express contract. (ECF No. 108 at 14).

The Court analyzes Plaintiff's breach of contract claim first. To prevail on a breach of contract claim, Plaintiff must show by the preponderance of the evidence that: (1) it entered a contract with Defendant Cha "containing certain terms," (2) Plaintiff performed its contractual obligations; (3) Defendant Cha breached the contract—that is, failed to perform his contractual obligations; and (4) Plaintiff suffered damages because of Defendant's breach. *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal citations omitted).

Unlike express contracts that are usually formed by words (either written or spoken), implied contracts arise from the parties' conduct, which focuses on whether the defendant's conduct, "'as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay.'" *Premier Orthopaedic Assocs. of S. NJ, LLC v. Anthem Blue Cross Blue Shield*, No. 22-02407, 2023 WL 3727889, at *5 (D.N.J. May 30, 2023) (quoting *Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 817 (D.N.J. 2000)). The elements for an implied contract are the same as those required for an express contract. *Matter of Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987).

In terms of whether their agreement contained certain terms: the parties engaged in extensive back-and-forth regarding the costs and the incentives for the work that Defendant Cha was undertaking for Plaintiff. (*See* Exhibit P-1). Overall, this back-and-forth resulted in Plaintiff remitting $13,000 dollars a month to pay Anyclo USA's expenses, and the parties set forth their course of conduct that would run through the course of their relationship until its dissolution.

Plaintiff argued that there was an implied contract through a "course of conduct" between the parties. As was established at trial, Plaintiff and Defendant Cha were introduced in the fall of 2016 and began a correspondence that was comprised of written offers and counteroffers.

Despite the lack of a written, formal contract, Mr. Song—working purportedly on behalf of Anyclo International—began an ongoing professional relationship with Defendant Cha. In September through October 2016, Defendant Cha and Mr. Song allegedly negotiated the terms of the business arrangement by email. These negotiations included compensation terms and business expenses. In terms of compensation, parties agreed to terms set forth in an email entitled "Anyclo USA Business and Incentive Plan" through their conduct. (Ex. P-1 at 27). Under this Plan, Defendant Cha would "receive 20% of operating profits + a sales incentive upon achieving the business plan." (Ex. P-1 at 27; *see supra* ¶ 13).

On November 2, 2016, Plaintiff wired $10,000 to Defendant Stafford Cha's bank account to set up Anyclo USA. A business plan was set forth in a November 30, 2016 email for Defendant to earn twenty percent of the operating profits, and for further incentives based upon additional sales achievements. (*See supra* ¶¶ 13-14). In a December 4, 2016 email, Defendant Cha counteroffered Mr. Song; Defendant Cha asked for an additional stipend for transportation expenses, raising the total amount to be remitted to Defendant Cha to $13,000.

The Court takes this opportunity to discuss two issues central to this agreement: Defendant Cha's role in the agreement and the term of the agreement. To the first point, although the record is devoid of written evidence as to the precise confines of Defendant Cha's role in the parties' business relationship, the parties' testimony is generally consistent on this matter. Defendants' Counsel described Defendant Cha as "sales representative" that made sales to the textile industry in the United States, "especially in the New York City area." (1T7:24–1T9:1). Defendants' Counsel further represented that given that Anyclo International had "no presence on the East Coast of the United States[,]" Defendant Cha was a good choice for this role. (1T8:25–1T9:1). Defendant Kim described her husband as an individual "in sales" who "ha[d] to make business trips a lot." (4T67:6–10). While Mr. Song never formally described Defendant Cha's role in his testimony, he described the intent of the role as a role for someone "who could help with obtaining

36

more buyers in the East Coast and that person was somewhere around New York."
(1T16:9–13). All of these descriptions show that the parties generally understood
Defendant Cha to be a sales representative working on behalf of Anyclo
International.[4]

To the second point, the Court believes the contractual term was for a period
of one year. The Court disagrees with Defendant Cha's claims that this relationship
was for a two-year term since this claim is unsupported by the evidence. The only
evidence in the record that anyone contemplated a two-year term is in Defendant
Cha's counteroffer to Plaintiff regarding his commission. (Ex. P-1 at 27). Defendant
Cha noted that the commission structure was acceptable, but that after two years, he
would seek to change it. This is a notice of his intent to negotiate in the future; it is
not the creation of a contract term. Indeed, it appears that the only individual who
ever thought there was a contract for two years was Defendant Cha.[5] The Court's
interpretation that the parties' contractual relationship was for one year is also

---

[4] There was some argument about whether Defendant Cha was a joint venturer or an
employee during trial and in the briefs. (*See* 1T65:2–16; ECF No. 66; ECF No. 97
at 1). The Court declines to analyze whether or not Defendant Cha was a joint
venturer or an employee given that it does not affect the causes of action set forth in
this opinion. *See generally Summit Transp. Corp v. Hess Energy Mktg.*, No. 14-
5119, 2019 WL 430863, at *12 (D.N.J. Feb. 1, 2019).

[5] The Court notes that there is testimony that Exhibit D-6 discusses a two-year term.
(*See* 4T29–4T31). As previously discussed, this exhibit is in Korean. The Court is
unable to verify its contents. Therefore, the Court does not rely on that document or
testimony regarding the same.

supported by the license agreement, which was slated to expire on October 31, 2017, (Ex. P-3 at 1), as well as the compensation charts which included the year "2017" in the title. (Ex. P-1 at 27).

Returning to the elements of a breach of contract claim, the Court analyzes the second element. For its part, Plaintiff undertook the obligations laid out in the parties' implied agreement by remitting the $13,000 payment each month. Plaintiff stopped paying when Mr. Song became suspicious of Defendant Cha. Thus, except for August, September, and November 2017 when Plaintiff failed to pay the required amount by $3,000 per month—or December 2017 when Plaintiff did not pay the 13,000 dollars at all—Plaintiff fulfilled his obligations. For his part, Defendant Cha undertook what was required of him. He opened a bank account at Bank of America for Anyclo USA, and he began to sell orders for Plaintiff's goods to buyers on the American market. To support the costs he was incurring, Defendant Cha remitted fraudulent accountings to Plaintiff to justify the costs remitted by Anyclo USA to Anyclo International.

To the third element of breach of contract, Defendant Cha breached the contract when the relationship disintegrated in February 2018, and Defendant Cha withheld Anyclo International's funds over which he was had possession.

To the fourth element of breach of contract: Plaintiff suffered damages as a result of Defendant Cha's breach. The BOA Account served as a personal bank account of sorts for Defendants Cha and Kim; they withdrew checks written out to themselves—including after the disintegration of the parties' business relationship. For instance, looking only at March 2018—the month in which the parties tried and failed to sort out their differences—the total withdrawals from the BOA Account to entities other than Anyclo International totaled $114,553.90. (Ex. P-1 at 69). This included $5,000 withdrawn to pay lawyers retained by Defendants for the present litigation as well as eight checks written out to Defendant Kim—each in the amount of $13,000. (3T50:17–20; Ex. P-7 at 69–70).

Based on the above, Plaintiff has sustained its cause of action for breach of contract against Defendant Cha.

For Defendant's breach of the contract claim, the analysis is the same for elements one and two.   For elements three and four—(3) whether Plaintiff failed to perform its contractual obligations and (4) whether Defendant suffered damages because of Plaintiff's breach—the Court finds that although Plaintiff failed to perform some of its contractual obligations, Defendant Cha has failed to show he suffered damages.

Anyclo International breached the agreement between the parties and memorialized in Exhibit P-7 by failing to pay the full amount of the monthly operating expenses for the months of August 2017, September 2017, and November 2017 by $3,000 per month. Additionally, Plaintiff failed to remit the full agreed-upon amount of $13,000 for December 2017.

However, Defendant Cha has failed to show the damages he suffered because of this breach for two principal reasons. First, Defendant Cha failed to provide any evidence of damage he incurred by continuing to have to pay Anyclo USA's expenses past the point that Anyclo International withheld payments from Defendant Cha. Defendant Cha provided no evidence that he continued to pay rent at the property in New York City for Anyclo USA nor did he submit any information supporting other expenses regarding the office's maintenance. To add to this, Defendant Cha offered no evidence as to the lease term or any remaining expenses that he might have incurred in the months following the dissolution of the business relationship.

Second, even if Anyclo International did not pay the amount it was contractually obligated to pay in those four months, Defendant Cha and Kim offset their loss by paying themselves from the Anyclo USA account. For instance, on August 22, 2017, Defendant Kim wrote a check of $7,000 dollars out to herself. The following day, she wrote a check of $6,000 dollars out to herself. (Ex. P-7 at 141–

42).  Similarly, on September 25, 2017, Defendant Kim wrote out a $13,000 check to herself.  (Ex. P-7 at 143).  On November 21, 2017, Defendant Kim wrote out a $13,000 dollar check to herself.  (Ex. P-7 at 145).  On December 22, 2017, Defendant Kim wrote a $13,000 check out to herself.  (Ex. P-7 at 146).  Therefore, Defendant Cha has failed to show that he suffered actual damage from Plaintiff's breach of the contract.

The Court notes separately that only a party to a contract may be held liable for breach of contract.  The parties presented no facts or arguments to show that Defendant Kim was subject to the contract.  Since only a party to a contract can be found liable for breach of contract, Defendant Kim is not liable under a breach of contract theory.  *DiGiacomo v. Statebridge Co.*, LLC, No. 14-6694, 2015 WL 3904594, at *8 (D.N.J. June 25, 2015).  As such, Plaintiff is entitled to compensatory damages against Defendant Cha for breach of contract.

### ii.  Commission on 2018 Sales

In addition to the claims for expenses incurred during the business relationship, Defendant Cha also seeks commission on sales made in 2018 between Anyclo International and Defendant Cha's buyers.  The Court has previously noted that there is no contractual basis for this claim given that there was no contractual

relationship for a two-year term. Therefore, there is no legal entitlement to commission from the year of 2018.

Accordingly, Defendant Cha's claim for commission fails.

### d. **Conversion**

Plaintiff argues that Defendants Cha and Kim converted Anyclo International's funds for which they are jointly and severally liable. In New Jersey, money may be the subject of a conversion claim so long as the money is identifiable. *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (internal citations omitted). The required elements of common law conversion are: (1) "the existence of property; (2) the right to immediate possession thereof belonging to plaintiff; and (3) the wrongful interference with that right by defendant." *SMP Properties v. Encore Realty, LLC*, No. 20-6676, 2023 WL 9002658, at *3 (D.N.J. Dec. 12, 2023) (internal citations omitted).

Here, the first element is met by the preponderance of the evidence because the BOA Account existed between December 2016 and December 2018 with various balances.

Element two, the right to immediate possession of the property belonging to Plaintiff, is also met by the preponderance of the evidence. Between December 2016 and February 2018, Mr. Song authorized the "immediate possession" of the BOA

Account balance to Cha during that timeframe. There was an implicit understanding that the funds did not belong to Defendants Cha and Kim; they were agents who were paying expenses for the operation of Anyclo USA with those funds and instructed to remit the remaining funds back to Anyclo International. This is evidenced by the information laid out in the November 23, 2016 email with the subject line "Re: On establishing a foreign corporation" that lays out that Anyclo International possessed 100% equity in Anyclo USA. (Ex P-1 at 24).

Similarly, element three is satisfied by the preponderance of the evidence. Between December 2016 and February 2018, Defendants Kim and Cha exercised control over the funds. However, by the very terms of their agreement, Anyclo International had the right to impose controls over Anyclo USA's BOA Account. These rights were not wrongfully interfered with until February 2018. In February 2018, Mr. Song confronted Defendant Cha and asserted Anyclo International's exclusive right of possession over the BOA Account. However, despite this assertion of control by Anyclo International, Defendants Cha and Kim blocked Plaintiff's access to the BOA Account. This is evidenced by Defendant Cha's refusal to transmit funds Anyclo International, and Defendant Kim's withdrawal of eight checks in March 2018 in the amount of $13,000 as well as the parties' withdrawal of $5,000 to pay their legal fees. Thus, both Defendants Cha and Kim wrongfully interfered with Plaintiff's rights to control those funds.

For these reasons, Plaintiff has satisfied the elements of common-law conversion by the preponderance of the evidence that the funds of the BOA Account were converted at the end of February 2018.

### e. **Fraud**

Plaintiff alleges that Defendant Cha misrepresented the actual amount of each start-up cost and each monthly operating expense to Mr. Song and other representatives of Anyclo International.   As such, Plaintiff claims these misrepresentations constitute an act of fraud.  For the reasons below, Plaintiff has failed to carry its burden.

As instructed by the New Jersey Model Jury Charges, to prove a cause of action for fraud, Plaintiff must show the following.

> The burden of proof is on the plaintiff to establish by clear and convincing evidence each of the following elements. First, that defendant made a false representation of fact to him/her. Second, that defendant knew or believed it to be false.  Third, that defendant intended to deceive plaintiff. Fourth, that plaintiff believed and justifiably relied upon the statement and was induced by it to (action taken or omitted). Fifth, that as a result of plaintiff's reliance upon the statement, he/she sustained damage.

New Jersey Model Civil Jury Charges § 3.30E.  In order to prove fraud, one must show the elements above by clear and convincing evidence.  Clear and convincing evidence is an intermediate burden of proof between a preponderance of the

evidence and proof beyond a reasonable doubt. *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3d Cir. 2013). Clear and convincing evidence is understood to mean evidence that would place the factfinder with "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal citations omitted).

To the first element—that Defendant make a false representation of fact to Plaintiff—Plaintiff has carried its burden. Mr. Song and Mr. Lee testified that Defendant Cha misrepresented the precise amount of the start-up costs and the monthly operating expenses by exaggerating the cost of rent, IRS taxes, worker compensation costs, and other expenses. According to Plaintiff, these misrepresentations constitute fraud.

Defendant Cha somewhat disagrees with this account. Defendant Cha testified that the specific cost of each monthly expense and the start-up costs were not germane to the parties. Defendant Cha asserts that only the overall monthly operating payment or $13,000 was relevant to him and Mr. Song. Defendant Cha claims that both Mr. Song and he were concerned with "lump sum $13,000 include everything, the rent, everything and I pay myself." (3T31:15–19). Mr. Song testified that he relied on Defendant Cha's representations of the monthly operating expenses because he "was not familiar with the situation in the US" although he was "very familiar with the Korean situation." (1T22:13–21). After having agreed to

45

these expenses, Defendant Cha presented a doctored license agreement to Mr. Song

to justify the amount of money Anyclo International was paying to Defendant Cha.

The presentation of altered legal documents—which necessitated the doctoring of

names and amounts due on a legal document—is an act that demonstrates a false

representation of fact by clear and convincing evidence.

To the second element—that defendant knew or believed that representation

to be false—Plaintiff also sustained its burden; the Court believes Defendant Cha

believed this amount to be false.  Defendant Cha testified that the specific cost of

each monthly expense and the start-up costs were not germane to the parties.

Defendant Cha asserted that only the overall monthly operating payment—

$13,000—was relevant to him and Mr. Song. Defendant Cha claims that both Mr.

Song and Defendant Cha were concerned with "lump sum $13,000 include

everything, the rent, everything and [Defendant Cha would] pay [him]self."

(3T31:13–19).  I do believe that these costs were inflated, as evidenced by the fact

that Defendant Cha produced a doctored agreement so that he could justify the

invoices that he himself generated and sent to Anyclo International. By their very

existence, the doctored agreements suggest the necessity to justify expenses that

were not otherwise defensible.  This last point relates to the third element of fraud—

that defendant intended to deceive plaintiff.  Again, the fact that Defendant Cha

produced doctored legal documents—documents that he again tried to doctor during

this litigation—shows by clear and convincing evidence that he knew the information was false.

However, it is under the fourth element of fraud that Plaintiff encounters difficulties sustaining its burden. The fourth element of fraud requires Plaintiff to show it relied on the representation in a manner "justifiable under the circumstances". The Model Civil Jury Charge Section 3.30E explains the element as follows:

> Whether the plaintiff was justified in relying on the representation depends upon whether the fact represented is one that a reasonable man would consider important in reaching a decision in the transaction in question. Even though it is not such an important fact, reliance may be justified if the defendant in making the representation knew that the plaintiff considered it important and would rely upon it.
>
> If you ultimately conclude that there was no justifiable reliance by the plaintiff or even if there was not a substantial factor in plaintiff's decision to enter into transaction your verdict will be for the defendant.

New Jersey's Model Civil Jury Charge § 3.30E. Plaintiff fails to meet its burden on this element because Mr. Song, as the agent of Anyclo International, was not justified in relying on the representations of Defendant Cha.

As previously stated, Defendant Cha had no experience incorporating a company nor with financial accounting in companies. In entrusting Defendant Cha with this task, Mr. Song took no due diligence in investigating the true cost of the

monthly operating costs and the start-up costs.  As previously stated, this conduct coming from a sophisticated business executive shows a level of carelessness demonstrating that Mr. Song was not justified in relying on these representations.  It shows carelessness and a lack of concern about the specific costs of his operation. No reasonably prudent businessman like Mr. Song would deposit monthly operating expenses and start-up costs into an unknown individual's account (Defendant Stanford Cha) without substantive internal controls over the use of the funds. As has been established, no such controls over those funds existed.

Even taking into account Mr. Song's testimony that he was not familiar with the general business situation in the United States and the fact that Mr. Song lives overseas, Mr. Song's reliance was not justifiable under the circumstances.  A reasonably prudent businessperson like Mr. Song would have exercised some level of control and oversight over Defendant Cha.  Such control could have been appointing a point of contact to monitor the BOA Account prior to the point where Mr. Song became suspicious of Defendant Cha.  Alternately or in addition, Mr. Song could have appointed an office manager to access the office space in New York City. These actions would have allowed control of the BOA Account and access to the office space.  Further, a reasonably prudent businessperson would not have relied on only the invoice that Defendant Cha provided to Anyclo International; a prudent

businessperson would have required the submission of the source documents such as bills and checks.

Based on the above, Anyclo International has failed to show the fourth element of common law fraud—that is, it has not shown that it relied on any representation of Defendant Cha in a justifiable manner under the circumstances because Mr. Song failed to undertake any due diligence. Accordingly, Plaintiff has failed to carry its burden to show by clear and convincing evidence that fraud has occurred.

This cause of action is dismissed.

### f. **Damages**

The Court next turns to the issue of damages. As an initial matter, Plaintiff's claims for monetary relief are muddled. For instance, under the breach of contract theory, Plaintiff seeks $415,939.78. (ECF No. 107 at ¶ 25). While Plaintiff appears to seek the same amount of damages under the conversion theory—plus a security deposit—for a total $419,307.00, (ECF No. 107 at ¶ 62), Plaintiff alternately requests a judgment on the breach of contract claim against Defendant Cha in the amount of $239,227.43. (ECF No. 107 at ¶ 26). In a similar way, Plaintiff requests a judgment in the amount of $242,594.65 against Defendant Cha and $141,545.85 against Defendant Kim for its conversion claims. (ECF No. 107 at ¶ 66). The Court

is unclear as to how these amounts reconcile with the total amounts given to the Court, and is unable to determine that fact based on the facts before it.

This question brings to bear a second issue—that is, the similarity of the remedies requested between the breach of contract and conversion claims. In New Jersey, the measure of damages for breach of contract is compensatory damages or alternately, damages that may "reasonably be supposed to have been contemplated by both parties." New Jersey Civil Model Jury Instruction § 8.45. In New Jersey, the measure of damages for common law conversion is "the fair market value of the converted chattel at the time of conversion . . . with interest from the date of conversion." New Jersey Civil Model Jury Instruction § 8.41.  Under both the breach of contract and conversion theories, Plaintiff seeks money damages; however, the amount of damages Plaintiff seeks under both theories appears to differ.  At their basic level, both causes of action seek damages representing the money Defendants took from the BOA Account from third-party purchasers for Anyclo International merchandise. *See Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 380 (D.N.J. 2021).  However, who may be held liable under these two theories of liability differs.  This issue aside, whether the remedies are duplicative was not addressed by either party.  As such, the Court invokes its equitable powers and analyzes the damages under a conversion theory only given that the Court believes

that the amount of damages under conversion theory is inclusive of the damages requested under the breach of contract theory.

As previously noted, much of the testimony at trial focused on the February 2018 confrontation between Mr. Song and Defendant Cha. It was at this point when Defendant Cha and Mr. Song realized their relationship had folded and that the dissolution of this relationship was unavoidable. At the end of February 2018, Defendant Cha offered a compromise that Mr. Song ultimately rejected. Accordingly, late February 2018 ended the alleged relationship between Defendant Cha and Mr. Song; it is at this time that Anyclo International's funds were converted by Defendants Cha and Kim. The amount of funds in the BOA Account converted at the end of February 2018 is in dispute. Specifically, how much money was in the account on February 23, 2018—the day Plaintiff sent its demand letter—is disputed.

The witnesses set forth a range from which the Court can make a reasonable assessment of the amount within the account. The witnesses testified as follows:

- Mr. Song testified that the amount of money in the BOA Account in February 2018 was approximately $547,482.08. (1T49:12–20). He explained that $500,000 "disappeared" at this time. (2T47:13–23). According to the Amended Complaint, Anyclo International alleged

that the amount in the BOA Account was $547,482.08. (*See* ECF No.
25 at ¶ 64).

- According to Mr. Lee, the amount in the BOA Account was
  approximately $568,653.32; his analysis was discredited. (Ex. P-13).
  As previously noted, Mr. Lee was not admitted as an expert, and the
  Court has questioned the validity of this report.  As such, I gave no
  credit to this amount.

- According to the BOA Account February 2018 Statement, on February
  22, 2018, the BOA Account balance was $523,859.06.  (Ex. P-7 at 66).
  On February 27, 2018, that amount was $507,313.21.  (*Id.*).

Notably, neither party presented any expert testimony from a forensic accountant to
verify the balance of the BOA Account in February 2018.  Since all the balances
differ, but all fall within a range of $500,000 to $547,482.08, I have estimated the
BOA Account balance to be at the approximate midpoint of the range or $524,000
on February 23, 2018.

Defendants Cha and Kim converted $524,000 funds belonging to Anyclo
International at the end of February 2018.  It is from this amount and from the
February 23, 2018 date that any reasonable adjustment will be made.

From the $524,000 amount, there are at least two major expenditures after late February 2018 from the BOA Account. The first expenditure occurred in March 2018 when Defendant Cha returned $250,000 to Anyclo International that had been held in the BOA Account. Deducting that amount from the converted funds reduces the amount owed by the Defendants. The Court sums the amount remaining in the account as of March 2018 below by subtracting the $250,000 deposit to Anyclo International from the 524,000 BOA Account balance on February 23, 2018. This leaves $274,000 as the remaining funds as of February 23, 2018.

The second expenditure happened in December 2018 when the BOA Account balance as of December 2018—$176,712.35—was deposited with the Clerk of the U.S. District Court pursuant to the December 4, 2018 Court Order. (ECF No. 18). Subtracting the amount of money deposited with the Court ($176,712.35) from the amount of money in the account as of February 23, 2018 ($274,000), the amount of unaccounted funds is $97,287.65. As previously noted, for an action of conversion, the measure of damages is the fair market value of the converted chattel which is the unaccounted funds—$97,287.65.

Accordingly, Anyclo International is entitled to the difference of money converted by Defendant Cha after the conversion in February 2018 that the Court calculated as of February 23, 2018, totaling $97,287.65.

### i. **August 2018 Third-Party Payment**

The Court also addresses an issue ancillary to damages that arose during this trial.   Specifically, the Court addresses allegations surrounding the accidental payment of $97,286.46 by a third-party buyer, Moret, into the BOA Account in August 2018. As evidenced by the BOA account statement from August 2018, on August 2, 2018, Defendant Cha received a $97,286.46 from a "Jacques Moret Inc."

Aside from these facts, the Court is not able to make any determinations surrounding this payment.  The parties have not explained why the payment was made or why it was accidental.  The litigants have not plead that Moret claims this money, nor that it was returned to Moret, nor have they suggested what should be done with it. As such, the Court is unable to make any findings of fact or conclusions of law with the information before it other than the fact that this money was deposited by a third-party buyer in August 2018 well after the disintegration of the parties' business relationship.

As such, the Court declines to exercise any judgment over the issue.  If any party objects to the same, it may bring a motion for reconsideration.

### IV.

In conclusion, Anyclo International is entitled to a judgment.  Since Defendant Cha and Defendant Kim converted the funds in the account in late February 2018,

Defendants Cha and Kim are liable. Specifically, Anyclo International is entitled to judgment in the amount of $97,287.65 against Defendants Cha and Kim for conversion of its funds. Additionally, Anyclo International is entitled to monies held by the Clerk.

The Court also enters judgment of no cause of action in favor of Defendants Stafford Cha, Mojo Moto, LLC, and Anyclo USA.

An order and a judgment follow.

_____
PETER G. SHERIDAN, U.S.D.J.