# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANYCLO INTERNATIONAL INC. a corporation, | Civil Action No. 18-cv-5759 (PGS) |
| *Plaintiff,* | **MEMORANDUM AND ORDER** |
| v. |  |
| YANG-SUP CHA an individual, *et al.* |  |
| *Defendants.* |  |

This Court, following a four-day bench trial, issued a Memorandum, a Judgment and an Order deciding this matter (ECF Nos. 109, 110, 111).  In its Memorandum, the Court found that Defendants Yang-Sup Cha and Nam-Hee Kim converted funds in the Bank of America ("BOA") Account in late February 2018 and Plaintiff Anyclo International ("Plaintiff") was entitled to damages in the amount of $97,287.65.  (ECF Nos. 109, 111).  Additionally, the Court found that Plaintiff was entitled to the $176,712.35 plus interest (ECF No. 110) that had been deposited with the Clerk of the U.S. District Court pursuant to the Court's December 4, 2018 Order (ECF No. 18).  Now, Plaintiff brings a Motion for Reconsideration of the Court's Memorandum and Judgment under Federal Rule of Civil Procedure 59. (ECF No. 112).

In its February 2024 Memorandum, the Court noted that there was an "accidental" payment of $97,238.46 by a third-party buyer, Moret, into the BOA Account in August 2018. Plaintiff argues that the Court committed an error of fact in concluding that the precise reason for this August 2018 third-party payment made to the BOA Account was unclear. (ECF No. 109 at 22). Defendants oppose this motion, arguing that Plaintiff's arguments are speculative and give rise to the risk of unjust enrichment. (ECF No. 113).

For the reasons below, the Court denies this Motion for Reconsideration.

## I.

A fulsome recitation of the facts underlying this matter is recited in the Court's February 14, 2024 Memorandum (ECF No. 109). The Court adopts those facts below:

1. Dong Guen Song, also referred to as Hopkins, (hereinafter, "Mr. Song") is the President and Director of Plaintiff Anyclo International. (1T14:16–18).

2. According to Mr. Song, Anyclo International "take[s] orders from garment brand companies and we manufacture clothing for those clients and export . . . those goods out of Korea." (1T14:23–1T15:2). Most of Anyclo International's clients were located on the West Coast of the United States.

(1T15:12–14).  Mr. Song estimated Anyclo International's annual sales to be approximately $40 million.  (1T15–1T16).

3. In 2016, Mr. Song sought to expand Anyclo International's operations to the East Coast of the United States (1T16:5–6).   Upon receiving a favorable recommendation from a business acquaintance, Mr. Song met with Defendant Yang-Sup Cha (hereinafter "Defendant Cha") in September 2016 in South Korea.  (1T17:4–5, 18).

4. In the fall of 2016, Mr. Song—working as an agent of Anyclo International— reached an ongoing business relationship with Defendant Cha.  Defendant Cha would generate new business by introducing buyers to Anyclo International with whom Defendant Cha had prior experience.  (1T18:19–22; 1T18:2–6).

5. In September through October 2016, Defendant Cha and Mr. Song allegedly negotiated the terms of this arrangement by email.  These negotiations are detailed in Exhibit P-1.

6. Exhibit P-1 is a series of Korean language emails accompanied by English translations.   These emails concern the alleged relationship between Defendant Cha and Anyclo International.  Within Exhibit P-1, Mr. Song introduces Defendant Cha to certain managers of Anyclo International.  After a meeting in South Korea on September 26, 2016, these managers and

Defendant Cha outlined the alleged terms of a business relationship between Anyclo International and Defendant Cha.

7. An October 19, 2016 email with the subject line "Anyclo NY brench (sic)" includes information sent by Defendant Cha to Jino Choi (hereinafter, "Mr. Choi"), Former Production Director at Anyclo International. This information was specific to establishing the Anyclo USA's office in New York. (Ex. P-1 at 9). Specifically, the email lays out several items—including both the timeline for the establishment of Anyclo USA's office in New York and the target date for the grand opening which was the end of October 2016. (*Id.* at 9).

8. Exhibit P-1 also itemizes the start-up expenses for the incorporation of Anyclo USA. The start-up costs included a registration fee ($1,500.00); a security deposit of three-months' worth of rent ($5,757.00); the office's first month's rent ($1,919.00); a cost for office landline set-up ($350.00); and office supply costs, including printer, and desktop charges ($1,200.00). The total expenses equal $10,726.00 (*id.*). The address of the proposed office was 112 West 34th Street, New York, 10120. (*Id.*).

9. Exhibit P-1 noted that on top of the start-up costs above, there were monthly operating expenses to be paid on the twenty-fifth of each month commencing on November 25. 2016. (*Id.* at 10). Exhibit P-1 notes that Anyclo

International would initially pay the start-up costs and the monthly operating costs to an individual account.   After November 25, 2016, the monthly operating expenses would be paid to a corporate checking account of Anyclo USA. (*Id.*).

10. Under a line in Exhibit P-1 titled "Business Related," the email also states that business cards would be produced identifying Defendant Cha as the Branch Manager/Director with a note requesting recommendations for an English title for Defendant Cha.  (*Id.*).

11. A subsequent email of Exhibit P-1 dated October 28, 2016 summarizes the terms of the relationship between Defendant Cha and Anyclo International. This email includes Defendant Cha's monthly pay, local taxes, local hiring requirements, commission, Internal Revenue Service ("IRS") tax liability, New York state employment tax, and worker's compensation. (*Id.* at 17–18).

12. On November 23, 2016, this relationship was still not ironed out.  At that time, Mr. Choi sent an email to Defendant Cha: "Please proceed with incorporation as follows.  Please inform if there are any documents that headquarters needs to prepare."  (*Id.* at 23).  Defendant Cha replied that he would "[a]sk the accountant to proceed as instructed" and he would "inform [Mr. Choi] if the need [for further documents were to] arise[]." (*Id.*).  The body of the email included several details including the company name, the

founder, the CEO, the business category, and the banking information for the bank account.  (*Id.* at 24).

13. On November 30, 2016, Mr. Choi emailed Defendant Cha again regarding "Anyclo USA Business and Incentive Plan."  Under this Plan, Defendant Cha would "receive 20% of operating profits + sales incentive upon achieving the business plan." (Ex. P-1 at 27).  The email included the following two tables:

| 2017 Business Plan | | |
|---|---|---|
| Revenue | US$5,000,000 | |
| Manufacturing margin | US$750,000 | 15% (based on ERP cost sheet) |
| Expenses | US$500,000 | 10% (including $150K for NY Branch) |
| Operating Profit | US$250,000 | 5% |

| Incentive 20% of operating profit + sales incentive | | | |
|---|---|---|---|
| Upon achieving business plan: US$50,000 | | | |
| Sales Incentive | | | |
| US$5 million or greater | US$6 million or greater | US$7 million or greater | US$8 million or greater |
| US$10,000 | US$15,000 | US$20,000 | US$25,000 |

14. In a response email dated December 4, 2016 with the subject line "RE New York Branch / Incentive plan," Defendant Cha wrote to Mr. Choi that "I think the incentive proposed is a bit less than the incentives I have agreed to so far.

In my judgment, it should be at least 1.5% of total sales volume." (*Id.* at 27). (Exhibit P-1 at 27).   However, Defendant Cha ambivalently accepted the commission of 20% operating profits plus the sales incentive because he would "comply with the company's decision for the first two years," but he requested an additional monthly payment of $1,000.00 for transportation costs.  This raised the monthly expenses to $13,000.   (*Id.*).  While there was no term to the contract in the correspondence, the tables provided in the emails suggest that the parties contemplated the contractual period to be for one year.

15. There is no formal written agreement that was executed by both parties. Instead, Exhibit P-1 is a series of offers and counteroffers sent between the parties that occurred over a period of time.  Further, the precise scope of Defendant Cha's role or responsibilities is not clearly defined in Exhibit P-1, but the parties seemed to agree generally that Defendant Cha would undertake to sell materials for Anyclo International.

16. Overall, Exhibit P-1 shows that Defendant Cha and Anyclo International agreed that Defendant Cha would incorporate Anyclo USA, a subsidiary company of Anyclo International, in New York to be named Anyclo USA (1T18:19–22).  Exhibit P-1 shows that Anyclo International would fund the start-up costs and the monthly operating expenses, and Defendant Cha would attempt to make sales on behalf of Anyclo International.  It also shows that

Anyclo International was understood to have 100% of the equity in Anyclo USA. (Ex. P-1 at 24).

17. Mr. Song testified that during the November and December 2016 time period, he was not familiar with federal taxes—either personal or business—worker compensation, and other costs; accordingly, Mr. Song relied on Defendant Cha's representations regarding the start-up costs and the monthly operating costs without conducting further personal investigation. (1T22:16–1T23:8). Mr. Song testified:

> It was not easy for us to find out through internet because I was not familiar with – so basically I was not familiar with the situation in the US at that time . . . .

(1T22:18–21). The record does not demonstrate that Defendant Cha had any practical experience in establishing a corporate organization like Anyclo USA nor that Defendant Cha had any experience with United States tax matters.

18. Thus, with this flimsy series of emails at Exhibit P-1—and no documented experience in establishing a corporation—Defendant Cha and Anyclo International commenced working together in November 2016.

19. Beginning in this same month, Anyclo International paid the monthly operational expenses and the start-up costs by way of a wire transfer into an account in the name of Defendant Stafford Cha, Defendants Cha and Kim's son. (1T30:25–1T32:4).

20. When asked why he deposited the funds with Defendant Stafford Cha, Mr. Song stated that he believed that Defendant Stafford Cha was the same individual as Defendant Yang-Sup Cha. (*E.g,* 1T31:2–18).    Mr. Song testified:

> Q.    Do you know what [who] Stafford Cha is?
>
> A.    I know that now. At that time, I didn't know.
>
> Q.    Could you tell the court who you believe Stafford Cha is now?
>
> A.    At that time, I understand Stafford Cha to be Mr. Yang-Sup Cha, but now I understand that Stafford Cha is his son.

(1T31:6–11).

21. Further, according to Mr. Song, he agreed to transmit funds ahead of the incorporation because the law required companies to be organized under the laws of a state and registered with the IRS to obtain an Employee Identification Number ("EIN") before a bank account could be opened. (*See* 2T9:25–2T10:23).  Since Anyclo International had no other entity established in the United States, Anyclo International deposited those sums with Defendant Stafford Cha until such time that Anyclo USA was incorporated and registered with the IRS.

22. Overall, this was a curious decision to deposit money with an individual with a different name than that of the person with whom Mr. Song had been dealing.  Mr. Song, a sophisticated international businessman, transmitted

payment to someone who Mr. Song did not know but of whom Mr. Song assumed the identity. This payment by a sophisticated corporate executive like Mr. Song flies in the face of common sense and experience. Further, it demonstrates a lack due diligence.

23. Another issue arising from this arrangement was the fact that Defendant Cha misrepresented the costs of starting up a business to Mr. Song. Specifically, he altered the first two pages of a legal document he himself executed in connection with the leasing of the third, fifth, and sixth floors at 1441 Broadway, New York, New York 10018. (*See* Exs. P-2, P-3).

24. In connection with Anyclo USA's office, Defendant Cha provided Anyclo International with a License Agreement found at Exhibit P-2 (hereinafter, the "Doctored Agreement") dated November 2, 2016. This License Agreement, however, is a doctored version of the original document found at Exhibit P-3; specifically, the first two pages of Exhibit P-3 are altered.[1] The Doctored Agreement laid out the licensor as Mojomoto Suites LLC with the license fee listed at $2,100 per month, the initial setup fee as $500, and the security deposit as $6,300. This Doctored Agreement represented an alteration of the original license agreement found at Exhibit P-3 where Times Square Suites

---

[1] Defendant Cha's deceit did not end here. During trial testimony, it came to light that Defendant Cha created a second doctored license agreement found at Exhibit P-19 to conceal his initial deception from Plaintiff's lawyers. (3T39:1-17).

LLC was listed as the Licensor and the monthly base license fee was $1,800, the initial setup fee was $300—but waived—and the security deposit was $3,600. Importantly, Mojomoto Suites LLC was a company created by Defendant Cha himself for the purpose of this deceit and replaced the actual licensor of the building. (*See* 3T33–3T35). The term of the agreement was unchanged between the two documents and was scheduled to run from November 1, 2016 through October 31, 2017. (*See* Exs. P-2, P-3).

25. From this company he himself created, Defendant Cha would invoice Anyclo International and have costs paid directly to himself. (*See* Ex. P-18). This invoice went so far as to charge sales tax on the invoice. (*Id.*). Operating expenses were $13,000 a month. *See supra* at ¶ 14.

26. Notwithstanding this trickery, Defendant Cha accomplished the opening of an office in the United States for Anyclo International, the creation of a bank account for the same, and the incorporation of Anyclo USA.

27. In late November 2016, Mr. Song acknowledged that he received the incorporation papers of Anyclo USA; the corporate documents designated Defendant Cha as the "person who will accept the process," *i.e.*, the registered agent. (1T61:21–1T62:19).

28. During this time period, Defendant Cha engaged in leasing office space in New York City from where Anyclo USA would operate. (1T22:7–1T24:2).

At that time, Defendant Cha signed and/or endorsed the lease agreement personally because Anyclo USA was not yet incorporated. (*Id.*).

29. Defendant Cha delivered the corporate book to Mr. Song in December 2016. (1T63:1–6).   The corporate book included the certificate of incorporation; otherwise, the corporate book was blank.  (1T63:9–13).  Notably, no shares were issued.

30. At that time, Mr. Song and Defendant Cha had not discussed whether common shares could be issued to Anyclo International. (1T63:16–17). Instead, Mr. Song maintained the corporate book as is (blank) because he "thought [he] just had to keep it with [him]."  (1T63:16–20).

31. Once Anyclo USA was incorporated and registered with the IRS, Defendant Cha opened a corporate checking account with Bank of America (hereinafter, the "BOA Account").   (1T71:18-24).   In establishing the BOA Account, Defendant Cha and his wife, Nam Hee Kim (hereinafter "Defendant Kim") named themselves as the sole authorized signatories of Anyclo USA's BOA Account.   (1T36:3–5).   On the formation papers underpinning the BOA Account, no representative of Anyclo International was an authorized a signatory.   (1T35:20–1T36:7).   More particularly, Mr. Song and his managers—Mr. Cris Lee and Ms. Alice Lee—were not authorized signatories.

32. According to Mr. Song, from the outset of the account, Defendant Kim was the "person who withdrew all the funds" from the BOA Account between December 2016 and December 2018. (1T71:18–1T72:6).

33. As such, the lease failed to identify Anyclo International or any Anyclo International representative who exercised control or possessed rights as a tenant under the lease.   As such, Mr. Song and his managers were not recognized as authorized tenants. (1T66:4–1T67:18).

34. Despite (1) the lack of stock issuance of Anyclo USA to Anyclo International, (2) the lack of control over the BOA Account, and (3) lack of access to the leasehold, the start-up costs and monthly operating expenses were paid timely between November 2016 until about August 2017.

35. From the above testimony, I find that Mr. Song and other managers of Anyclo International failed to take appropriate precautions or oversight over Anyclo USA.

36. During this time period, Defendant Cha contacted prospective buyers on behalf of Anyclo USA.   As he testified at trial: "I contacted the buyers and I visited buyers in order for me to sell the product." (3T115:19–20).  Defendant Cha sold product to the buyer's companies.   Anyclo International manufactured the product and delivered same to the buyers.

37. There was an established business practice followed by Defendant Cha and Anyclo International. Specifically, when Anyclo International delivered product to a buyer, the buyer would pay Anyclo USA. Apparently believing that their agreement meant that Defendant Cha was to remit the full amounts of money received from third-party buyers, Mr. Song became suspicious in Fall 2017 because he believed Defendant Cha was not transmitting the full payments that had been received by Anyclo USA. (1T39:9–11). Mr. Song stated that Defendant Cha "would not send money back to us . . . . Also the payment from the buyers were sent to us partially." (1T39:15–21). He continued: "it is a clear sign that something is not going right." (1T39:22–1T40:19).

38. And indeed, Mr. Song's instincts were correct. For instance, Anyclo USA received a wire from Reflex Performance on April 27, 2017 for $203,524.40. (Ex. P-7 at 19). This same month, Anyclo USA received a $13,000 wire from Anyclo International to pay Anyclo USA's expenses on April 24, 2017. (*Id.*). Defendant Cha only remitted $200,900.20 to Anyclo International on May 2, 2017. (Ex. P-7 at 23). Thus, Defendant Cha retained $2,624.20 of the third-party payment without explanation.

39. After becoming suspicious, Mr. Song reduced the payments of the monthly operating expenses to $10,000 for the months of August, September, and

November 2017. It was Mr. Song's testimony that he reduced the monthly operating expenses because the balance in the BOA Account was sufficient to allow Defendant Cha to withdraw the difference. (1T52:14–20).

40. By December 2017, Mr. Song concluded that Defendant Cha was "stealing" Anyclo International's funds. (1T50:25–1T51:9). Accordingly, Mr. Song did not authorize the December 2017 monthly payment. Suffice it say, this is the point where any remaining business relationship between the parties began to crumble.

41. Meanwhile, Defendant Cha learned that representatives of Anyclo International were directly communicating with Defendant Cha's contacts (that is, his buyers) to exclude Defendant Cha from the sales process. (2T47:11–22). Defendant Cha further asserts that representatives of Anyclo defamed his reputation in the garment industry during their communications. *See infra* ¶ 48.

42. Disputes also arose over the payment of Defendant Cha's commission for the sales he made on behalf of Anyclo International. Exhibit D-34 summarizes the sales transactions between Anyclo International and a third-party seller, Moret, in various years including 2017. Mr. Song testified that his accounting department determined that Defendant Cha was not entitled to a commission, (2T40:17–24), because—as Mr. Song stated—the accounting department

15

reported "said minus, loss of the business. And the report showed a total sales and the minus profit . . . ." (2T40:23–2T41:5).

43. As a result, sometime in the last two months of 2017, Mr. Song forwarded the accounting department's report and its finding that there was no profit on the sales to Defendant Cha concluding that "I hope we will do better business in 2018." (2T40:23–2T41:5).

44. Sometime in January 2018, Defendant Cha ceased communication with Anyclo International. Without any communication with Defendant Cha, Mr. Song attempted to seize control and secure the assets of Anyclo USA. At this point, Mr. Song had no access to the office space or the BOA Account.

45. Mr. Song faced a predicament. He summed it up aptly:

> A.     First of all, Anyclo USA's employee is only one person [Cha] . . . when it comes to my ownership of the company, I was not able to do anything about it, I was not able to access anything. I was not allowed to even go up to the office, therefore I was not any party of the company with any rights to the company.
>
> Q.     So is that the proof that you're not the owner of Anyclo USA?
>
> A.     That is correct. First of all, certificate of incorporation, New York State division of incorporation and EIN, IRS, any records with them, I could not find my name. It was only Mr. Cha's name on it, Mr. Cha's name in all of them.

Q.      So isn't that showing your misunderstanding of the ownership of Anyclo USA?

A.      I don't think it was a misunderstanding. First of all, the true owner should be able to deposit or withdraw money. Also; the true owner should be able to make – open a credit card. Also, the true owner should be able to even enter any kind of lease agreement. Defendant did all of them, but he gave me just one document, which was a blank document, so just based on that, could I think I was the owner of this company? I think it just didn't make any sense.

Q.      So from the time the company Anyclo America was incorporated in November of 2016, until the real dispute broke out in February 2018, for fourteen months, you didn't really find out who was real owner was?

A. Yes, I thought I was the owner.

Q.      Okay. Mr. Song, earlier you testified that Mr. Cha is authorized to sign checks with the bank, correct?

A.      When it comes to that, I found out only after the subpoena that all that was done by Ms. Nam-Hee Kim, all checks were signed by her.  So even now, I cannot tell who the real owner is anymore. I want to know that.

Q.      You want to find out?   Did you search all the documents from the banks?

A.      BOA, Chase and PNC.

Q.      Did you receive all the bank documents, not just the bank statements?

A.      What other documents?

Q.      Well, I mean who is authorized to sign for the company Anyclo America.

> A.     No, I have not received anything like that. The employees, the number of employees I have is not just one or two. Ten or twenty. We are talking about maybe one employee in Anyclo USA.
>
> Q.     I don't understand.
>
> A.     The only employee of Anyclo USA was one person, Mr. Cha. So I think Mr. Cha was the only person in those – with those authorities.
>
> Q. So isn't that true, Mr. Cha is the only authorized person by the company, Anyclo USA?
>
> A. No. Again – that's what I thought, but after I did some research, what I found out afterwards, it was Ms. Nam-Hee Kim.

(1T67:25–1T70:7).

46. During this same time period of January 2018, Defendant Cha refused to remit any further funds from the BOA Account to Anyclo International.

47. Toward the end of February 2018, Mr. Song traveled to New York to confront Defendant Cha.   (1T55:24–1T56:4).  Mr. Song visited Defendant Cha's residence in New Jersey. (1T56:5–7).  According to Mr. Song, Defendant Cha was home, but Defendant Cha refused to answer the door.  (1T56:8–13).  On February 23, 2018 through its counsel, Anyclo International sent a notice to Defendant Cha demanding the return of the monies owed.  (*See* 1T75:4–18).

48. On February 24, 2018, Mr. Song emailed some of Defendant Cha's buyers and informed them about the dispute between Mr. Song and Defendant Cha.

(*See* Ex. D-22). In an email to a buyer on which Defendant Cha is CC'ed, Mr. Song wrote the following. In relevant part, the email states: "Attn. Cha Please call me immediately i/o hiding. (sic). No need double face (sic). I do Not want disturb Moret and other customers anymore due to your disconnection with company moment. (sic). CALL ME NOW and do Not make any further problem for customers. (sic)." (Ex. D-22).

49. On February 26, 2018, Plaintiff terminated Anyclo USA's company email address. (ECF No. 108 at ¶ 46).

50. After many unanswered calls and emails from Mr. Song, Defendant Cha agreed to meet to discuss the dissolution of their business relationship. According to Mr. Song, at the meeting Defendant Cha demanded three things: a) that the operating expenses be paid for the alleged contract period of two years; b) that Defendant Cha be paid a percentage of gross sales as commission; and c) that Mr. Song forward a letter to the buyers "explaining . . . that the incident was just an internal misunderstanding." (1T58:6–25).

51. In return, Defendant Cha would forward $250,000 to Anyclo International. Once the letters were forwarded, Defendant Cha would transmit another $250,000. Around that time, Defendant Cha transmitted $250,000 to Anyclo International from the BOA Account. (1T60:8–9).

52. Mr. Song did not forward the explanatory letter to the buyers. As a result, Defendant Cha did not transmit the discussed $250,000 to Anyclo International. Meanwhile, in March 2018 Defendant Kim withdrew eight checks in the amount of $13,000 each, totaling $104,000. (Exhibit P-7 at 153–61). Additionally, Defendants Cha and Kim withdrew $5,000.00 that they used to pay Graham Curtin, their legal counsel. Graham Curtin later merged with McElroy Deutsch. Defendant Cha would later pay McElroy Deutsch $45,278.76 in fees from the BOA Account.

53. Plaintiff filed the Complaint in this case on April 9, 2018. (*See* ECF No. 1).

54. Around four months after the filing of the Complaint, on August 2, 2018, a third-party buyer paid $97,386.46 to Anyclo USA's BOA Account. (Ex. P-7 at 97; *see* 2T88:14–24). Plaintiff claims that this was a mistake by the third-party buyer. However, the precise reason for this payment was not made clear through trial testimony.

(ECF No. 109 at ¶¶ 1-54)

## II.

Under Federal Rule of Civil Procedure 59, "a motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." F.R.C.P 59(e). The scope of a motion for reconsideration under Rule 59(e) is

"extremely limited[,]" *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011), and may be granted based upon "'(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.'" *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (internal citations omitted).

"Reconsideration motions may not be used to relitigate old matters or to raise arguments or present evidence or allegations that could have been raised prior to entry of the original order." *Edison C. F. v. Decker*, 20-cv-15455, 2021 WL 1997386, at *4 (D.N.J. May 19, 2021) (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5 (2008)). Further, as the Third Circuit has explained:

> "[N]ew evidence," for reconsideration purposes, does not refer to evidence that a party obtains or submits to the court after an adverse ruling. Rather, new evidence in this context means evidence that a party could not earlier submit to the court because that evidence was not previously available.

*Howard Hess Dental Labs. Inc.*, 602 F.3d at 252 (internal citations omitted).

## III.

This Motion for Reconsideration surrounds a particular issue in the February 14, 2024 Memorandum surrounding the Court's decision on the conversion Count: a third-party payment in the amount of $97,386.46 to Anyclo USA's BOA Account

after (1) the disintegration of the business relationship between Plaintiff and Defendant Yang-Sup Cha and (2) about four months after the filing of the underlying Complaint in this matter. The Court made limited findings of fact and conclusions of law about the $97,286.46 deposit from Moret; the Court was concerned that "Moret" might have some right to the funds. The Court indicated it would reconsider its decision if facts surrounding this were brought before it. Specifically, the Court made the following conclusion in its February 2024 Memorandum:

> The Court also addresses an issue ancillary to damages that arose during this trial. Specifically, the Court addresses allegations surrounding the accidental payment of $97,286.46 by a third-party buyer, Moret, into the BOA Account in August 2018. As evidenced by the BOA account statement from August 2018, on August 2, 2018, Defendant Cha received a $97,286.46 from a "Jacques Moret Inc."
>
> Aside from these facts, the Court is not able to make any determinations surrounding this payment. The parties have not explained why the payment was made or why it was accidental. The litigants have not pled (sic) that Moret claims this money, nor that it was returned to Moret, nor have they suggested what should be done with it. As such, the Court is unable to make any findings of fact or conclusions of law with the information before it other than the fact that this money was deposited by a third-party buyer in August 2018 well after the disintegration of the parties' business relationship.
>
> As such, the Court declines to exercise any judgment over the issue. If any party objects to the same, it may bring a motion for reconsideration.

(ECF No. 109 at 54).

In terms of new evidence, Plaintiff pleads the following. Plaintiff points to specific evidence of third-party payments. Specifically, Plaintiff points to "[e]very

monthly account statement [on the Bank of America Account] from December 2016 to December 2018" which "unequivocally demonstrate[d]" that the third-party buyer was Jacques Moret, Inc. "to whom Plaintiff was delivering goods on a regular basis during the course of Anyclo USA's operations." (ECF No. 112-1 at 10). Further, Plaintiff points to the evidence of Plaintiff's Commercial Invoice dated May 28, 2018 that shows the amount due as $97,286.46—the same amount as that third-party deposit in August 2018—to support an argument that this money was deposited accidentally in the BOA Account controlled by Defendant Cha. In supporting its argument, Plaintiff points to the Court's timeframe in evaluating the transaction when the Court determined that Mr. Cha was in "immediate possession" of the BOA Account. (ECF No. 109 at 43). In essence, Plaintiff's request is that the Court amend its findings of fact and conclusions of law to find that the conversion was on-going and that it continued past February 2018 and into the period in August 2018 when this additional deposit was made.

Having examined these facts and reviewed the record, the Court did not make an error of fact or law with respect to this payment. In its February 14, 2024 Memorandum, the Court found that Plaintiff had satisfied the elements of common law conversion by the preponderance of the evidence in that the funds of the BOA Account were converted at the end of February 2018. (ECF No. 109 at 44). However, Plaintiff did not sustain a cause of action to conversion as to any period

other than between December 2016 and February 2018—the period in which Defendant Yang-Sup Cha was in immediate possession and control of the accounts.

Testimony surrounding the time period after February 2018 and after the disintegration of the business relationship between Plaintiff and Defendant Cha was not developed at trial; indeed, the crux of testimony and evidence presented surrounded the period of time up until the filing of the lawsuit. With respect to this third-party payment, the extent of the discussion of this payment at trial was that it was "a mistake."[2]  Thus, while Plaintiff claims that this third-party payment was made in error, without testimony from the third-party buyer—which the parties were free to provide during trial—the Court cannot decide differently. Particularly in the present circumstances where the Court found there to be credibility and record-keeping issues throughout the testimony and the underlying litigation, the "new"

---

[2]      When questioned surrounding this testimony, Mr. Song offered the following testimony:

"Q: So if you look at page two of P13, on August 2nd, 2018, Morett made a payment to the Anyclo USA bank account in the amount of $97,286.46?

A: Yes

Q: Is that correct as part of your review in P13?

A: The information in here is correct, but Morett made the mistake of sending it to the wrong account.

Q. So my question for you, Mr. Song, was the $97,286.46 transmitted by Mr. Cha to Anyclo International or are we arguing about that here today?

A. Obviously

A. Obviously this amount had to be sent to us, but he didn't."

(2T88:14-24).

evidence presented (which are bank statements and an invoice which the Court already possessed and considered) is insufficient to meet the burden of proof. And since "[r]econsideration motions may not be used to relitigate old matters or to raise arguments or present evidence or allegations that could have been raised prior to entry of the original order[,]" the Court cannot change its conclusion. *Decker*, 2021 WL 1997386, at *4 (internal citations omitted).

Important too is the fact that this evidence is not "new." "'[N]ew evidence,' for reconsideration purposes, does not refer to evidence that a party obtains or submits to the court after an adverse ruling." *Howard Hess Dental Labs. Inc.*, 602 F.3d at 252 (internal citations omitted). New evidence in the reconsideration context is "evidence that a party could not earlier submit to the court because that evidence was not previously available." *Id.* Here, the Court possessed these account statements and the invoice when making its initial determinations. The fact that testimony surrounding this evidence was not developed at trial does not render the evidence new nor does it meet the burden of proof. As the Court explained in its February 14, 2024 Memorandum: "the Court is unable to make any findings of fact or conclusions of law with the information before it other than the fact that this [August 2018 deposit] was deposited by a third-party buyer in August 2018 well

after the disintegration of the parties' business relationship." (ECF No. 109 at 54).

No facts or circumstances regarding this conclusion have changed.[3]

Since there is no claim from Moret, the Court denies the Motion for Reconsideration.  An appropriate order follows.

---

[3] Since the entry of the Court's Memorandum, Order, and Judgment, a dispute surrounding the funds held in the Court Registry Investment System Liquidity Fund account (*See* ECF No. 110) has arisen.  As set forth in the Assistant United States Attorney Jordan Anger's ("Mr. Anger's") May 17, 2024 letter on the docket (ECF No. 116), there was a separate criminal matter captioned *United States v. Anyclo International, Inc.* (23-cr-419) (hereinafter, the "Criminal Matter") occurring during a portion of this litigation.  This matter was presided over by Judge Salas.  A Turnover Order against Anyclo International was entered in the Criminal Matter. Specifically, Judge Salas ordered that the $176,712.35 plus any interest accrued held in the Court Registry Investment System Liquidity Fund be applied towards Anyclo International's outstanding restitution debt. (*See* ECF No. 117 at Ex. A).  Following some confusion, the Court conferenced with Mr. Anger and Plaintiff's Counsel on May 30, 2024 so that the parties might clarify their positions.  After conferencing, Mr. Anger—on behalf of the Government—and Plaintiff's Counsel noted that the parties had agreed to the disbursal of all funds to Plaintiff's Counsel.  After disbursal and after relevant costs were deducted from that sum, Plaintiff's Counsel would remit those funds to the Government.  Mr. Anger stated that he would petition Judge Salas for a withdrawal of the Turnover Order so that this Court may disburse the funds to Plaintiff's Counsel pursuant to the Court's February 14, 2024 Order.  These events do not create a new fact or circumstance affecting this Motion given that they do not bear upon the question before the Court: the conversion of funds in the BOA Account by Defendant Cha against Plaintiff Anyclo International and the third-party deposit to the BOA Account made in August 2018.

## <u>ORDER</u>

This matter having come before the Court on Plaintiff's Motion for Reconsideration (ECF No. 112), and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented, and for good cause shown, and for all of the foregoing reasons,

**IT IS** on this **12**th of **June, 2024**,

**ORDERED** that Plaintiff's Motion for Reconsideration (ECF No. 112) is **DENIED**.

_____
PETER G. SHERIDAN, U.S.D.J.